# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 12/20/2022 09:56 AM Sherri R. Carter, Executive Officer/Clerk of Court, by G. Carini,Deputy Clerk

1 | Kristen G. Simplicio (State Bar No. 263291)
  | Anna Haac (*pro hac vice* forthcoming)
2 | **TYCKO & ZAVAREEI LLP**
  | 2000 Pennsylvania Avenue Northwest, Suite 1010
3 | Washington, District of Columbia 20006
  | Telephone: (202) 919-5852
4 | Facsimile: (202) 973-0950
  | *ksimplicio@tzlegal.com*
5 | *ahaac@tzlegal.com*

6 | Sabita J. Soneji (State Bar No. 224262)
  | Cameron R. Partovi (State Bar No. 319589)
7 | **TYCKO & ZAVAREEI LLP**
  | 1970 Broadway, Suite 1070
8 | Oakland, California 94612
  | Telephone: (510) 254-6808
9 | Facsimile: (202) 973-0950
  | *ssoneji@tzlegal.com*
10 | *cpartovi@tzlegal.com*

11 | Eric Rothschild (*pro hac vice* forthcoming)
   | **NATIONAL STUDENT LEGAL**
12 | **DEFENSE NETWORK**
   | 1701 Rhode Island Avenue Northwest
13 | Washington, District of Columbia 20036
   | Telephone: (202) 734-7495
14 | *eric@defendstudents.org*

15 | *Counsel for Plaintiffs*

16 |                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

17 |                           **COUNTY OF LOS ANGELES**

18 |

19 | IOLA FAVELL, SUE ZARNOWSKI, and    | Case No. 22STCV39350
   | MARIAH CUMMINGS, *on behalf of themselves and*
   | *all others similarly situated*,              | **CLASS ACTION COMPLAINT**

20 |

21 |                 Plaintiffs,

22 |        v.

23 | UNIVERSITY OF SOUTHERN
   | CALIFORNIA and 2U, INC.,

24 |                 Defendant.

25 |

26 |

27 |

28 |

CLASS ACTION COMPLAINT
*Favell, et al., v. University of Southern California, et al.*, No.

Exhibit 1
7

Plaintiffs Iola Favell, Sue Zarnowski, and Mariah Cummings ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants University of Southern California ("USC") and 2U, Inc. ("2U") (collectively, "Defendants"). Plaintiffs, by and through their counsel, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## INTRODUCTION

1.      In March 2022, USC made headlines for its decision to withdraw its Rossier School of Education ("USC Rossier") from the U.S. News & World Report's ("US News") ranking of graduate schools of education. The US News annual ranking of educational institutions is the single most referenced source of school prestige and academic standing that prospective students consult when selecting a school. Through a single number on a list, the rankings are intended to convey each university's selectivity, reputation, and academic quality. The rankings play a critical role in prospective students' academic decisions, making USC's recent decision to withdraw from these rankings shocking. Even more shocking was the reason why: an internal investigation by USC's counsel Jones Day revealed that USC had submitted erroneous data to inflate USC Rossier's rankings for years.

2.      This Complaint centers on that rankings fraud, and in particular, the way in which USC—in concert with its partner and for-profit, publicly-traded corporation, Defendant 2U—aggressively advertised USC Rossier's fraudulent rankings to grow enrollment in the school's online programs. Defendant 2U offers technology platforms for the provision of online programs and uses the name and branding of schools like USC, which can charge students top dollar. USC hired 2U not only to provide technical support, but to run the advertising and recruiting for those online programs. The two agreed to split the profits, with 2U, the recruiter, receiving an estimated 60% of all tuition revenues, while USC, the ostensible educator, received only 40%. This arrangement may be illegal; under most circumstances, federal regulations prohibit institutions from compensating recruiters based on enrollment, in recognition of the fraud that often occurs when financial motivations are introduced. And fraud is exactly what happened here.

Exhibit 1
8

3.      When 2U first began operations in 2008, online schools were not widely trusted by the public, and certainly not seen as the province of elite institutions. In opening an online program with a for-profit partner, USC risked reputational damage to USC Rossier and the institution as a whole. As for 2U, USC was its first and only customer at the time, and 2U's ability to attract other partners depended on its ability to build trust in USC's online degrees. When the relationship was forged, USC Rossier ranked #38 in the US News annual "Best Graduate Schools of Education" ("Best Education Schools"), and Defendants knew that preserving or bettering that ranking was key to growing USC Rossier's online program while furthering their reputational and financial interests.

4.      Around the time USC and 2U finalized their contract, USC submitted its first batch of altered data to US News. Specifically, it cherry-picked amongst USC Rossier's admissions selectivity data, capturing only a small percentage of its in-person doctoral students for its submission, a game it would play until it was caught in 2021. The fraud paid off: between 2008 and 2009, USC Rossier vaulted from #38 to #22. In the years that followed, USC Rossier jumped even further, consistently landing in the top 20, ultimately soaring to an inflated high of #10 in 2018—all while USC Rossier's online offerings and enrollment expanded.

5.      As time went on, public trust in online programs grew, but so did the financial stakes, as Defendants faced increased competition in the online space from other schools and online program management companies ("OPMs"). Competition had grown so fierce that in 2013, US News rolled out its first edition of a specialized ranking of best *online* education graduate programs – and USC Rossier only ranked #44. In 2014, when USC was one of just five clients and its largest revenue source, USC Rossier did not participate in those rankings. 2U went public that same year, and there is no public record of the school's participation in that less publicized specialty ranking since. Instead, Defendants relied exclusively on USC's doctored ranking in the better-known Best Education Schools ranking going forward – both in marketing and in 2U's revenue projections. As 2U told investors, "*any decline in the ranking of one of our clients' programs or other impairment of their reputation, could have a disproportionate effect on our business.*" It emphasized that student enrollment in its online programs at USC, and therefore 2U's revenue, would drop if there was "*[a]ny decline in USC's reputation.*"

Exhibit 1
9

6.     To reach more students, in 2015, 2U and USC rolled out an online doctorate degree. At that time, USC Rossier's rankings—and 2U's revenues—had been kept afloat because the rankings data submitted had excluded most of its doctoral students. With the then-dean admitting that the inclusion of data on the hundreds of new online doctoral students would cause USC Rossier to "***drop like a rock in the rankings***," there would be no turning back. Ultimately, USC never submitted ***any*** selectivity data from Rossier's online EdD program, nor any other online program, to the Best Education Schools ranking, as these programs standing alone would have been poorly ranked in comparison to the in-person programs.

7.     For years, Defendants leveraged their fraudulent ranking in advertising and recruiting. Indeed, the rankings are so important to a student's academic choices that one study found that a school's increase in the US News rankings by only one point (e.g., from #19 to #18) on average raises the number of applicants to the school by 0.9%. Because USC did not meaningfully restrict the number of people that could be enrolled in the online programs, USC Rossier's jump in its US News rankings from #38 to #10 would have translated to a 25% increase in applicants with a corresponding increase in enrollment and revenue, and thus, Defendants had every incentive to advertise the ranking far and wide. As the years went by, the rankings were increasingly promoted on the USC Rossier's homepage, as well as on pages of the website relating to the school's online degrees. To reinforce the message with prospective students, 2U spent millions on search term optimization and broad-based online advertising campaigns that targeted prospective students. And both Defendants touted the ranking via social media posts and press releases, ensuring the message reached all prospective online students multiple times.

8.     But Defendants never disclosed to those interested in the online programs that the ranking relied on data measuring only a select portion of USC Rossier's in-person degree programs. This was by design: 2U's contract with USC required USC to promote the online degrees in a manner comparable to the promotion of the in-person degrees and included other language to ensure consistent marketing. Knowing that USC Rossier's ranking would suffer, following the uncovering of USC's US News rankings fraud, USC Rossier withdrew itself from that year's edition of the Best Education Schools ranking rather than reveal its true selectivity numbers. And on December 15, 2022,

the dean of USC Rossier stated that the school had voluntarily decided to no longer participate in future editions of the rankings. Rather than accept the financial and reputational ruin that would follow from the submission of accurate data, particularly about its online students, Defendants chose to keep the truth hidden.

9.      Defendants' scheme paid off. Since USC's manipulation of the data supplied to US News, USC Rossier's ranking has stayed comfortably in the top 20 – out of hundreds of education schools. And 2U catapulted from one of the first start-ups of its kind to a $2 billion-dollar, publicly traded education industry juggernaut. As 2U's CEO stated in 2019: "*The partnership with USC Rossier built the entire company*." But the foundation of the company's success was fraud. Defendants used the ranking to mislead hundreds of students, many of whom were or wanted to be teachers, into enrolling at the school, as well as to pay its steep price tag. Indeed, USC Rossier is one of the most expensive education schools in the country, and its students paid a significant premium for the privilege of attending what Defendants caused them to believe was a highly ranked graduate program.

10.     Plaintiffs bring this lawsuit on behalf of themselves and the class of similarly situated USC Rossier students who paid tuition that they would not have otherwise paid (or would have paid substantially less), had they not been drawn in by USC Rossier's fraudulently obtained US News ranking. Defendants' misleading, years-long scheme to boost USC Rossier's US News ranking and related efforts to disseminate that ranking via a long-term false advertising campaign, violated California's False Advertising Law ("FAL") (Cal. Bus. & Prof. Code § 17500), California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200), and California's Consumer Legal Remedies Act (the "CLRA") (Cal. Civ. Code §§ 1750 *et seq.*).

## THE PARTIES

11.     Plaintiff Iola Favell is a resident of Los Angeles, California.

12.     Plaintiff Sue Zarnowski is a resident of West Haven, Connecticut.

13.     Plaintiff Mariah Cummings is a resident of New York City, but until 2020, resided in San Mateo, California.

**Exhibit 1**
**11**

14.     Defendant University of Southern California ("USC") is a non-profit corporation incorporated under the laws of California with its principal place of business in Los Angeles, California.

15.     Defendant 2U Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Lanham, Maryland. It has employees and offices throughout the country, including in Los Angeles. 2U is a publicly traded corporation that trades on the NASDAQ exchange under the symbol "TWOU." Until 2012, 2U did business under the name 2tor, Inc.[1]

16.     When the term "Defendants" is used in this Complaint, it refers to defendants USC— including USC Rossier School of Education—and 2U collectively.

17.     Each defendant is a "person" as defined in Business and Professions Code section 17201.

18.     All of the conduct that forms the basis for this Complaint has been undertaken by Defendants by and through their agents, employees, officers, or others acting on their behalf.

## JURISDICTION AND VENUE

19.     Jurisdiction over Defendants and venue in this Court is proper because USC is headquartered in this County and 2U conducts significant business within this County, and because acts and omissions complained of herein occurred within this county.

20.     This Court has subject matter jurisdiction over this class action pursuant to Code of Civ. Proc. § 410.10, Bus. & Prof. Code § 17204, Cal. Civ. Code § 1780(c), and the California Constitution.

---

[1] 2U and 2Tor are the same company in all but name. *See* Second Addendum to the Master Services Agreement on Behalf of the School of Social Work (executed March 14, 2014), www.sec.gov/Archives/edgar/data/1459417/000104746914002453/a2218872zex-10_21.htm (last visited Dec. 17, 2022) (2U contract with USC School of Social Work, stating that 2U "is the same legal entity and has the same rights, responsibilities and obligations (legal and otherwise) as 2tor, Inc"). The Complaint refers to 2U and 2tor interchangeably.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.    At the Heart of USC and 2U's Relationship is a Problematic Agreement that Provides Financial Incentives to 2U to Aggressively Recruit Students to USC Rossier's Online Graduate Programs**

21.    USC is a well-known, private non-profit university that has historically offered a vast array of in-person graduate and undergraduate degree programs, including through its school of education, USC Rossier.

22.    2U is a for-profit, online program management ("OPM") corporation that began operating as an education technology start-up in 2008, primarily to service USC, its first customer and, to this day, its largest client. In or around 2008, USC entered into a joint venture with 2U to develop the first of USC Rossier's online programs, a Master of Arts in Teaching ("MAT"), which went live in June of 2009.[2]

23.    OPMs like 2U contract with universities to create and oversee online courses and programs and are typically engaged to set up technology platforms for the online classroom, recruit students for the program, and help develop the curriculum. 2U and other OPMs have been criticized for their tuition-sharing arrangements.[3] These arrangements commit an often significant and ongoing percentage of student tuition revenue to the OPM, potentially in violation of the Incentive Compensation Ban in the Higher Education Act, which prohibits institutions participating in federal student loan programs from providing "incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities." 20 U.S.C. § 1094 (a)(20). The law was passed to protect students from recruiting practices and ballooning student loan debt that serve the financial interests of the recruiter at the expense of the students' educational needs.

---

[2] *USC Rossier, 2tor Inc. Offer Online Degree*, USC News (Sept. 15, 2008), news.usc.edu/15353/USC-Rossier-2tor-Inc-Offer-Online-Degree/.

[3] Letter from United States Senators Elizabeth Warren, Sherrod Brown, and Tina Smith to OPM Executives (January 14, 2022), https://www.warren.senate.gov/imo/media/doc/2022.01.14%20Follow%20up%20letter%20to%20Online%20Program%20Managers%20(OPMs)_.pdf

Exhibit 1
13

24.     As discussed herein, USC and 2U's tuition-sharing model resulted in the aggressive and deceptive marketing and recruitment practices that the Incentive Compensation Ban is designed to stop.

> **1.     USC Incentivized Recruitment When It Agreed to Pay 2U a Substantial Portion of Tuition for the Students Recruited for Online Degrees at USC Rossier.**

25.     On October 29, 2008, following Defendants' development and announcement of USC Rossier's first online Master of Arts in Teaching program, and shortly before the program went live, Defendants entered into a Services Agreement.[4] A version of this contract is still in effect today, though it was amended on at least one occasion, on or around 2015, when USC and 2U began offering online Doctor of Education degrees ("EdDs"). The contract will remain in effect through at least 2030.[5] This contract has many of the hallmarks of the problematic business practices for which OPM partnerships have been criticized.

26.     For example, under the terms of the 2U/Rossier Services Agreement, 2U receives repayment for advancements it made to build the program, as well as an undisclosed percentage of tuition revenue from students enrolled in USC Rossier's online degree programs, and receives a higher percentage of tuition revenue if a certain enrollment threshold is met.[6] As 2U explained:

> Under our contracts with each of Rossier and the School of Social Work, we are entitled to a specified percentage of the net program proceeds. With Rossier, we are eligible for an increased percentage of net program proceeds if the net program proceeds exceed a specified level. We advanced funds to Rossier to help fund the startup of the MAT program, and these advanced amounts were subject to recoupment against portions of the net program proceeds under specified conditions.

[4] Attached as Exhibit A is a public version of the Services Agreement, dated Oct. 29, 2008, as retrieved from the website of the Securities Exchange Commission, at www.sec.gov/Archives/edgar/data/1459417/000104746914001172/a2218267zex-10_1.htm. A number of terms were redacted by 2U prior to its submission of the document to the SEC and remain in Defendants' exclusive control.

[5] See 2U, Inc., *2U, Inc. Reports First Quarter 2016 Financial Results*, PR Newswire (May 5, 2016), https://www.prnewswire.com/news-releases/2u-inc-reports-first-quarter-2016-financial-results-300263949.html (2U press release announcing that its contract with USC Rossier was extended through 2030).

[6] 2U, Inc., Prospectus (Form 424(b)4) (March 27, 2014), at 94, https://www.sec.gov/Archives/edgar/data/1459417/000104746914003136/a2219368z424b4.htm ("Prospectus"); *see also* Ex. A at § 3(C).

27.     2U receives tuition revenue "for virtually all the degree programs" it supports.[7] According to a July 6, 2022, report in the Wall Street Journal, "Universities frequently provide 2U with *60%* of the tuition for online degree programs."[8] The percentage 2U receives from USC Rossier is likely similarly high, in keeping with 2U's arrangements with other graduate degree programs.

28.     The arrangement was suspect from the get-go as a tuition-sharing agreement of this nature is a straightforward violation of that Incentive Compensation Ban. As discussed in the next section, 2U, like many OPMs, relies on the legally dubious "bundled services exception" to the Ban. But even if Defendants' arrangement could satisfy the criteria needed for that narrow exception to apply, tuition sharing between OPMs and schools leads to bad outcomes for students.

29.     On December 3, 2022, a group of U.S. Senators and House members called on the Department of Education to take a critical look at OPMs revenue-sharing practices generally. Among the examples of fraud they identified was a recent scandal at the online division of USC's School of Social Work, also run by 2U.[9] Among other problems, the Wall Street Journal reported that the program "had one of the worst combinations of debt and earnings" compared to similar master's degree programs.[10]

30.     Even 2U's founder, who left the company in 2012, now speaks critically of tuition-sharing arrangements, stating that such arrangements "blur the lines separating what's best for the

---

[7] Letter from 2U, Inc. CEO Christopher Paucek to United States Senators Sherrod Brown, Tina Smith, and Elizabeth Warren (Jan. 28, 2022), at 2, ddfoqzqsu0zvp.cloudfront.net/media/documents/FINAL_2U_Reponse_to_Senators_Brown_Smith_Warren_2022_luDAKtT.pdf).

[8] Lisa Bannon & Rebecca Smith, *That Fancy University Course? It Might Actually Come From an Education Company*, The Wall Street Journal (July 6, 2022), https://www.wsj.com/articles/that-fancy-university-course-it-might-actually-come-from-an-education-company-11657126489 (emphasis added).

[9] *See generally*, Robert C. Scott, et al., *Letter to Miguel Cardona, Secretary of the Department of Education*, House Committee on Education and Labor (Dec. 2, 2022), n. 13, https://edlabor.house.gov/imo/media/doc/scott_delauro_murray_warren_smith_letter_to_ed_re_online_program_managers.pdf (citing Lisa Bannon & Andrea Fuller, *USC Pushed a $115,000 Online Degree. Graduates Got Low Salaries, Huge Debts.*, The Wall Street Journal (Nov. 9, 2021), https://www.wsj.com/articles/usc-online-social-work-masters-11636435900).

[10] Bannon & Fuller, *supra* n. 9

student and what's best for the recruiter."[11] And other universities are finding that incentive compensation does not work. In December 2022, the president of the online division of the University of Arizona explained that the school decided to terminate its relationship with an OPM because the OPM's financial motives were at odds with students' interests. Specifically, he stated:

> Like most other OPMs, its operations focused on generating leads and recruiting students — more so than retention and student success. In exchange for its services, Zovio took a cut of UAGC's revenue. We found we had irreconcilable differences because this approach was not student-centered.[12]

31.     With millions of dollars in federal student aid going to online degree programs every year, educational industry experts as well as regulators have expressed concern that nonprofit educational institutions like USC will become reliant on OPM partnerships to generate revenue and that profit motivations will compromise student education, while driving up student debt loads.[13] To that point, 2U included in its contract with USC, a provision that has been referred to as a "poison tail"; even if USC Rossier provides 2U with the agreed-upon one-year written notice of termination, it must continue paying 2U a share of revenue for up to three additional years after termination (or until all currently enrolled online students complete their degrees). *See* Ex. A, at 5(E)(ii)-(iii). Without early termination, USC Rossier's current contract with 2U will not expire until *2030*. 2U's CEO has bragged to the media that the company's contracts with its partner universities are "non-cancelable."[14]

**2.     Defendants' Contract Lacked Important Safeguards to Prevent Aggressive, Deceptive Recruiting.**

32.     Notwithstanding the Incentive Compensation Ban, in 2011, the Department of Education published a non-binding Dear Colleague Letter (DCL) to advise that the incentive compensation ban might not apply to entities who provide both recruiting and services such as

---

[11] John Katzman, *Opinion: Why are colleges and universities handing over more than half of their tuition to online program managers?*, The Hechinger Report (Dec. 26, 2016), https://hechingerreport.org/colleges-universities-handing-half-tuition-online-program-managers.

[12] Paul Pastorek, *President Speaks: To put students first, colleges need to rethink the OPM model*, Higher Ed Drive (Dec. 12, 2022), https://www.highereddive.com/news/president-speaks-university-arizona-global-campus-uagc-cut-ties-opm/638420.

[13] *See* n. 3, 9, *supra.*

[14] Harriet Ryan & Matt Hamilton, *Must Reads: Online degrees made USC the world's biggest social work school. Then things went terribly wrong*, Los Angeles Times (June 6, 2019), https://www.latimes.com/local/lanow/la-me-usc-social-work-20190606-story.html

1    advertising, counseling, and other support services."[15] The Department explained that for this bundled

2    services exception to apply, the school had to "provide[] the actual teaching and educational services,"

3    and set enrollment numbers, stating:

> When the institution determines the number of enrollments and hires an unaffiliated third party to provide bundled services that include recruitment, payment based on the amount of tuition generated does not incentivize the recruiting as it does when the recruiter is determining the enrollment numbers and there is essentially no limitation on enrollment.[16]

7    33.    There is no public evidence that USC ever placed limitations on 2U's recruitment

8    numbers, and their arrangement incentivized the parties to act otherwise. While Defendants' contract

9    states that enrollment shall be limited to 50 students for the "initial semester, in order to give both

10   parties the opportunity to further develop the Program," the contract does not identify any limit to

11   the number of students that can be enrolled in the Online Programs after that.[17] Rather, as set forth

12   in Paragraphs 35 and 38, the contract pays 2U a higher percentage if it recruits more students.

13   34.    While the contract gives USC the right and discretion to set unspecified admissions

14   standards and determine which qualified students shall be accepted, the contract gave 2U outsized

15   influence on that process. In particular, it required USC and 2U to "cooperate to make the admissions

16   process and the application of Admissions Standards streamlined, transparent and clear to enable [2U]

17   to target its promotional efforts to students likely to be accepted," and not merely those who were

18   qualified.[18]

19   35.    The contract also had other terms that aligned USC's interests in expanding enrollment

20   with 2U's. Because USC was also responsible for expenses associated with the offering of online

21   programs, and 2U was taking an enormous share of tuition, capping enrollment would not serve its

22   financial interests. Moreover, 2U "advanced funds to Rossier to help fund the startup of the MAT

23   program, and these advanced amounts were subject to recoupment against portions of the net

---

25   [15] *See* March 17, 2011 Letter from the U.S. Department of Education, Office of Postsecondary Education, GEN-11-05, at 11 (available at

26   https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN1105.pdf).

27   [16] *Id.*

      [17] Ex. A § 5(A).

28   [18] *Id.* § 1(B), 2(A)

1   program proceeds under specified conditions."[19] The higher the enrollment revenue, the faster USC's

2   debt to 2U would be reduced.

3       36.     Even if USC were to restrict enrollment or raise admissions standards, 2U retained

4   leverage. As it explained to investors, while 2U typically agreed not to contract with another institution

5   to offer a competing degree program, that agreement "becomes inapplicable if a client either refuses

6   to scale the program to accommodate all students qualifying for admission into the program, or raises

7   the program admissions standards above those at the time of contract execution."[20] Were USC to try

8   to restrict admissions, it risked 2U initiating a competing program elsewhere.

9       37.     Because USC did not set strict and meaningful enrollment limits, fraud was inevitable,

10  particularly because online programs do not have the same barriers to enrollment that in-person

11  programs do. Online programs do not have physical space limitations restricting the number of

12  students who are able to attend any given class or program, and enrollment can expand without the

13  same corresponding increase in fixed costs. While some online classes were live, at times, USC and

14  2U also used pre-recorded or other asynchronous instructions, and thus, money could be saved on

15  faculty costs and teaching time. And interest in the programs would not be limited to only those who

16  wanted to live in Los Angeles.

17      38.     For 2U, a publicly traded company that is obligated to maximize returns for its

18  shareholders, driving up enrollment is critically important. As 2U's CEO put it in 2018:

19          [G]enerating enrollments from an existing thing is good, but it doesn't pay long-term.
            You have to be able to continue to deliver on it, year after year. And if you got 100
20          students in a program, it's a lot harder to have it be 150, and then have it be 200, and
            have it be 250, so we have to continue to innovate. We [2U] do that.[21]
21

22  In short, 2U's primary mission is not to educate students, but to grow its business by continuously

23  profiting from an increasing number of students. 2U has grown into a $2 billion company by doing

24  so.

25  ───────────────

26  [19] Prospectus at 94. *See also* Ex. A, § 2(C) (iii) (redacted schedule of advancement of funds), §2(D)(iv) (redacted schedule of repayment of funds).

27  [20] *Id.* at 94.

28  [21] 2U Q4 2018 Earnings Call Transcript, The Motley Fool (April 15, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/26/2u-twou-q4-2018-earnings-conference-call-transcrip.aspx

39.     It was no surprise then that 2U would use aggressive recruiting and that USC would permit it. 2U's application advisors persistently called student applicants, sometimes as often as every other day, to pressure applicants to enroll in USC Rossier. They were authorized to waive application fees to remove barriers to capture and ensure enrollment, resulting in students paying to attend the costly online degree programs.

40.     As hundreds of students enroll every year, 2U's revenues from Defendants' partnership are substantial. Indeed, since Defendants' partnership began, USC has charged between $38,000 and $148,000 for USC Rossier's online degrees. The popular online Master of Arts in Teaching degree has historically cost upwards of $50,000; many of the online EdD programs cost more than $100,000.

### 3. To Ensure the Success of 2U's Online Programs, Defendants Agree to Position Them as Equivalent to Traditional In-Person Education.

41.     At the time Defendants' partnership began in 2008, public trust in online educational programs was low. The most well-known online degree programs were those associated with for-profit schools, several of whom were defending lawsuits by regulators and consumers over their fraudulent tactics. With the launch of USC Rossier's online programs and the outsourcing of key aspects of those programs to 2U, USC took the risk that by associating itself with online degree offerings, its reputation and ranking would suffer. And 2U's revenue and growth model hinged on its ability to change public perceptions of online programs. In describing its risks to investors, 2U stated in 2014 that, "Students may be reluctant to enroll in online programs for fear that the learning experience may be substandard, that employers may be averse to hiring students who received their education online or that organizations granting professional licenses or certifications may be reluctant to grant them based on degrees earned through online education." [22]

42.     2U accordingly sought out elite institutions that could lend credibility to online degrees and be marketed in a way that would be attractive to students. And to this end, USC did not want its reputation harmed by this same distrust of online degrees. Accordingly, Defendants incorporated into

---

[22] Prospectus at 15.

Exhibit 1
19

their contract an agreement that USC Rossier's online programs would be marketed as consistent with the in-person programs, without any carve out for situations where doing so would be misleading. Specifically, in Section 2(A) of their contract, labeled "Recruitment," Defendants agree these online programs "shall be branded as 'USC/Rossier'," and USC commits to "promote the [online MAT] Program . . . in a manner comparable to the promotion of [USC] Rossier's in-classroom MAT program."

43.     The contract also contains other provisions to ensure the online programs were seen as the same as the rest of USC Rossier. USC agreed to permit 2U to use USC's trademarks and other branding elements to facilitate 2U's "marketing and promotion" efforts.[23] While USC retained the right to approve all marketing materials, USC was required to "consult with 2tor in the development of additional Promotion Strategies."[24] And USC broadly delegated to 2U responsibilities relating to "recruiting students into the [MAT] Program" at USC Rossier,[25] and creating and executing "marketing and promotional strategies" to attract students to the online programs.[26]

44.     In accordance with the contract, since the beginning of their relationship, Defendants have marketed USC Rossier's online degrees to prospective students as equivalent to USC Rossier's in-person degrees, which are exclusively delivered and administered by the non-profit USC Rossier.

45.     For example, during the class period, USC maintained the main Rossier website, rossier.usc.edu ("Rossier Website") and Defendants shared responsibility for managing the pages that were specific to the online degrees, located at rossieronline.usc.edu ("Rossier Online Webpages"). But the Rossier Website advertised the online programs side by side with the in-person programs, and was designed to allow seamless navigation to the online pages to obtain more information about those specific degrees. "USC Rossier" was featured prominently on all Rossier Online Webpages, and reference to 2U generally only appeared in fine print.

---

[23] *See* Privacy Policy, USC Rossier Online (April 29, 2021), § 4(A), www.rossieronline.usc.edu/legal/privacy-policy/.
[24] Ex. A, § (2)(A)
[25] *Id.* § 1(A).
[26] *Id.*

46.     Defendants also used "application advisors," who were supposed to help students through the application process, but in actuality were employed to drive up enrollment and revenue for Defendants. Although these application advisors were employed by 2U, not USC Rossier, they used rossieronline.edu email addresses and their email signatures did not disclose any affiliation with 2U, but rather falsely identified them with the USC Rossier Office of Admission and Scholarship.

**B.      Throughout the Class Period, Defendants Engaged in a Campaign to Fraudulently Improve USC Rossier's Standing in the US News Rankings to Accomplish Their Goal of Elevating the Reputation of Online Programs.**

47.     Defendants looked to market the in-person and online degrees in a unified, comparable manner, and found a solution in the US News rankings. 2U has repeatedly acknowledged that rankings go to the core of public trust in a program, and are a material consideration for graduate students, and therefore, 2U's bottom line. For example, it told investors that a poor ranking would hurt their investment, stating:

> *Damage to client reputation.* Because we market a specific client degree program to potential students, the reputations of our clients are critical to our ability to enroll students. Many factors affecting our clients' reputations are beyond our control and can change over time, including their academic performance and ranking among nonprofit educational institutions offering a particular degree program.[27]

Similarly, it explained to investors that they faced risks if rankings declined, explaining: "As a result of the small number of programs, the material underperformance of any one program, including the failure to increase student enrollment in a program, or any decline in the ranking of one of our clients' programs or other impairment of their reputation, could have a disproportionate effect on our business."[28]

48.     When USC and 2U began exploring the possibility of working together, USC Rossier was ranked as the 38th best graduate education program in US News. What followed next was fraud. In particular, Defendants manipulated and artificially inflated USC Rossier's rankings to recruit prospective students into online degree programs, for which they would charge top dollar. As Defendants expanded the online programs, the differences between the in-person and online

---

[27] Prospectus at 15.

[28] *Id.* at 20.

Exhibit 1
21

1  programs grew, but Defendants pushed harder to equate the two. They omitted data on online

2  students and misleadingly held those rankings out as not just legitimate, but applicable to USC

3  Rossier's online students, when they were not. As a result, students paid tuition price premiums that

4  they otherwise would not have.

5       49.    Through the manipulation of data, USC Rossier would jump to #22 in the edition of

6  the rankings published a few months after Defendants formed their agreement and just before 2U's

7  marketing would ramp up. This jump in the rankings did not happen by luck or stricter admissions

8  criteria. It was fraud, as revealed through an internal investigation conducted by USC's outside counsel,

9  the law firm Jones Day. Among other things, USC had manipulated its student selectivity data to cause

10 its "doctoral acceptance rate" to plummet **from 50.7% in the 2009 edition to only 10.5% in the**

11 **2010 edition**. The result was that USC Rossier was ranked in the Top 20, out of hundreds of schools,

12 for years.

13      50.    Defendants used USC Rossier's US News ranking as a centerpiece of their efforts to

14 drive students to the online degrees. To drive enrollment to the online programs, Defendants engaged

15 in a two-part scheme. **First**, as discussed in this section, they consistently and knowingly submitted

16 inaccurate, incomplete data to US News to increase USC Rossier's Best Education Schools ranking[29]

17 **Second**, as discussed in more detail in Section C, *infra*, Defendants used their fraudulently-procured

18 Best Education Schools ranking to market the online degrees, all the while withholding data from

19 those online degrees that would have affected their rankings.

20           **1.    The US News Annual School Rankings are Critically Important**
                    **to Schools for Marketing Purposes and for Students in**
21                  **Deciding Where to Attend**

22      51.    The US News school rankings have "become the dominant source of college rankings

23 for schools, students, and news outlets."[30] A 2013 study found that a school's increase in the US News

24 rankings by only one point (e.g., from #19 to #18), will raise the number of applicants to the school

25

---

26 [29] *Best Education Programs* (Ranked in 2008), U.S. News & World Report, [archived by the WayBack
   Machine (Sept. 13, 2008), web.archive.org/web/20080913195215/http://grad-
27 schools.usnews.rankingsandreviews.com/grad/edu/search/page+2].

28 [30] Michael Luca & Jonathan Smith, *Salience in Quality Disclosure: Evidence from the U.S. News College
   Rankings*, 22 J. Econ & Mgmt. Strategy 58, 59 (2013).

Exhibit 1
22

by 0.9%.[31] USC's jump in its US News rankings from #38 to a high of #10 over the time period of 2009–2021 would thus translate to a 25% increase in applicants each year with a corresponding increase in enrollment and revenue.

52.      Because the Department of Education does not require universities to publish data regarding the university's individual graduate programs, prospective graduate students are even more dependent on the US News rankings than prospective undergraduate students.

53.      Although participation in US News rankings is voluntary, USC and other schools have historically participated because they know how important the rankings are to academic decision-making. The updating of rankings each year has been described as "a marquee event in higher education."[32] Schools, including USC Rossier, extensively promote their rankings in marketing materials and merchandise, and even develop "strategic plans around the rankings."[33] Robert Morse, the chief data strategist for US News, who has run its annual rankings projects since 1989, stated that US News receives several phone calls *per week* from university administrators who ask "why they rank the way they do."[34]

54.      US News prepares its annual Best Education Schools rankings by soliciting and receiving certain data from graduate education schools. The publication's rankings team develops surveys and accompanying instructions to ensure that schools are collecting data in a consistent way. The Best Education School rankings are published annually, typically in March, using data collected for the academic year that begins the prior fall. Each edition, however, uses the following calendar year in its title. For example, US News published the "2021" rankings in March of 2020 using data collected in the fall of 2019 for those students enrolled during the fall 2019 semester.[35]

---

[31] *Id.* at 58.

[32] Daniel de Vise, *U.S. News colleges rankings are denounced but not ignored*, Washington Post (Sept. 3, 2011), https://www.washingtonpost.com/local/education/us-news-college-rankings-are-denounced-but-not-ignored/2011/09/02/gIQAn6BzzJ_story.html.

[33] *Id.*

[34] *Id.*

[35] *See, e.g.*, *School of Education Rankings Data Reporting Investigation*, Jones Day (Apr. 27, 2022), at 4, customsitesmedia.usc.edu/wp-content/uploads/sites/545/2022/04/29110617/Rossier-Rankings-Report-4.27.22.pdf ("Jones Day Report") ("In the fall of 2017, US News released its 2018 survey (for the 2019 rankings").

Exhibit 1
23

55.     As of the US News 2022 rankings, US News scored education graduate schools based on eleven criteria, each of which is assigned a different weight based on its perceived importance to determining academic quality. In relevant part, "student selectivity"—designed to measure the incoming doctoral student body's academic competitiveness—is weighted to 18% of the education school's total score, and is comprised of three sub-criteria: (1) acceptance rate (6%); (2) mean GRE quantitative scores (6%); and (3) mean GRE verbal scores (6%).[36]

56.     Despite the focus of US News methodology on the selectivity of doctoral degree programs (as opposed to master's degree programs), the Best Education Schools rankings are intended to be a measure of an institution's overall graduate education offerings, and were used by Defendants to market to those seeking both master's and doctorate degrees. Indeed, US News refers to the ranking as "the overall Best Education Schools ranking." Moreover, the methodology does not distinguish between data relating to a school's in-person and online degrees.[37]

**2.     For Years, Defendants Provided Inaccurate, Flawed Data to US News, Which Resulted in an Inflated Ranking for USC Rossier in the US News Best Education Schools Rankings.**

57.     In the 2009 edition of the US News Best Education Schools, published in the spring of 2008, USC Rossier was ranked #38. USC Rossier, like all schools that submitted data in connection with that edition, would have gathered data in the fall of 2007 for those students enrolled in the 2007-2008 academic year. By the fall of 2008, USC and 2U had entered into their first contract. In June of 2009, the first 50 students began the pilot semester of the online Master of Arts in Education degree, and efforts to enroll more students for future semesters were underway. In early 2009, US News published the 2010 edition of the rankings (compiling data gathered in the fall of 2008), and USC shot

---

[36] Robert Morse et al., *Methodology: 2023 Best Education Schools Rankings*, U.S. News & World Report (Mar. 28, 2022), www.usnews.com/education/best-graduate-schools/articles/education-schools-methodology

[37] *E.g.*, Jones Day Report at 24, App'x A (2014 Best Education Schools Rankings, asking for information regarding "doctoral programs" without distinguishing between in-person and online programs); Morse, *Methodology: 2023 Best Education Schools Rankings* (Mar. 28, 2022).

up to #22.[38] From that point on, USC consistently scored in the top 20. USC Rossier's rankings in recent years were: #15 (2017 ed.); #10 (2018 ed.); #12 (2019 ed.); #12 (2020 ed.); #11 (2021 ed.).[39]

58.     Jones Day's report, published in April 2022, revealed that the data USC Rossier submitted to US News was plagued with problems. The most documented problem was that, contrary to US News's instructions, USC only submitted data for purposes of determining "student selectivity" from its highly selective in-person Ph.D. program and not from its significantly less-competitive EdD programs, which initially were offered only in-person, but after 2015, were also offered online.[40] The result was that USC Rossier's "doctoral acceptance rate" dropped forty percentage points in one year.[41] Following the uncovering of USC Rossier's rankings fraud in 2022, USC Rossier withdrew from the rankings and is currently listed as "unranked."

59.     While the precise methodology employed by US News may have changed in certain respects over the years, throughout the period relevant to this action (2009 through 2021), US News always included student selectivity in its formula, and required schools to submit data, including student selectivity data, regarding **all** of the school's education doctoral programs.[42]

60.     Although Jones Day reported that it was unable to locate a complete set of records from the earlier years that the fraud was occurring, it "reviewed available US News rankings for education schools over the last two decades and observed that the School of Education's doctoral acceptance rate dropped drastically between the 2009 and 2010 rankings (50.7% in 2009; 10.5% in 2010)," which explains USC Rossier's dramatic 16-point rise in the rankings.[43]

---

[38] *News Alert: U.S. News & World Report Ranks USC Rossier School of Education among Top 25 in 2010 'America's Best Graduate Schools in Education,' among Top 10 in Private Universities*, (Apr. 23, 2009), [archived by the WayBack Machine, web.archive.org/web/20090526024726/http://rossier.usc.edu/images/world_news_report.pdf]

[39] US News publishes the annual editions of the rankings in the preceding calendar year. Thus, the 2021 edition was published in 2020.

[40] Jones Day Report at 1.

[41] *Id.* at 18.

[42] *Id.* (stating that the 2002 US News rankings included the "Ph.D and EdD acceptance rate" as a criterion for ranking education schools)

[43] *Id.* at 6, n. 3

Exhibit 1
25

61.     In those first years of Defendants' partnership, from 2009 through 2014, USC Rossier typically admitted approximately 15 PhD students a year, while admitting hundreds of EdD students. Because USC Rossier's EdD programs are less selective, USC Rossier would have been lower ranked if data from those programs had been included in the school's survey submissions to US News.

62.     In 2012, personnel at USC Rossier challenged its decision to exclude EdD data, demonstrating that USC understood that the omitted data was required. In response, then-Dean of USC Rossier Karen Symms Gallagher stated: "[W]e would look terrible if they [US News] counted the EdDs the same as PhDs."[44]

63.     Shortly thereafter, in 2014, 2U went public. At the time, USC was one of only five 2U clients, and critical to its profitability, accounted for 69% of revenues.[45] As it told investors:

> We expect USC will continue to account for a large portion of our revenue until our other client programs become more mature and achieve significantly higher enrollment levels. Any decline in USC's reputation, any increase in USC's tuition, or any changes in USC's policies could adversely affect the number of students that enroll in these two programs.

64.     In 2015, public acceptance of online degrees had grown, but competition among online programs was increasing. To attract more students and drive growth, 2U ventured into offering online doctoral degrees, and with USC, it launched an online EdD program. Because it was a longer program than the master's degree in Education, Defendants could charge over $100,000 in tuition. 2U's ability to turn a profit from an EdD program with USC depended on its ability to recruit and enroll a large number of students, which would be stymied if it had to adhere to the doctoral selectivity number that USC was submitting to US News (reflecting only PhD admissions, not in-person EdD admissions), and admit just 10% of applicants. 2U counted on the online EdD program being much less selective than what the rankings reflected, a circumstance that cannot be reconciled with its ever-improving US News ranking.

65.     In launching this EdD program, 2U and USC stood to gain more than ever from the misrepresentation of data to US News. Defendants understood that accurate reporting of selectivity

---

[44] Id.; see also, Prospectus at 20.
[45] Id.

Exhibit 1
26

1   data would lower USC Rossier's ranking even further once they rolled out the new EdD online

2   program in 2015 and enrolled even more students. At the same time, both USC and 2U had a lot to

3   gain. 2U had just gone public, and the EdD programs' steep price tag would be good for shareholders.

4   Reporting EdD selectivity data to USNWR would jeopardize that profit potential and potentially

5   severely damage 2U, which continued to rely heavily on USC's reputation and tuition revenues.

6          66.     In late 2015 and 2016, USC would have been preparing its 2016 survey responses for

7   the 2017 edition of the rankings. At that time, the first of the new online doctoral students, recruited

8   by 2U, were beginning their studies in the new Organizational Change and Leadership ("OCL") EdD

9   program, and were supposed to be captured in the survey responses. But Defendants refused, opting

10  to continue to supply incomplete information. In March 2016, Dean Gallagher stated: "I plan to begin

11  a campaign with [US News] this spring that will explain why we are not going to continue giving any

12  information about any of our EdD programs. *Unless we are successful, we will drop like a rock*

13  *in the rankings*, particularly when the OCL has over 500 EdDs enrolled at any one time and that

14  number is combined with our on campus ed leadership program."[46]

15         67.     While USC had always been concerned about the impact the EdD data would have on

16  its selectivity score, and by extension, its ranking, the addition of the online EdD program significantly

17  exacerbated those concerns. A USC Rossier employee admitted to Jones Day that Gallagher "wanted

18  online EdD programs excluded because [she] thought that they would affect the School's selectivity

19  score."[47] As a result, from 2016 onwards USC was not providing US News with any selectivity data

20  from its online programs, even though Defendants intended to and did aggressively promote the

21  resulting rankings to students considering their online programs. And, as discussed in Paragraph 82(c),

22  around that same time, Defendants even increased their marketing efforts around the rankings.

23         68.     While Defendants were excluding the online EdD students from the rankings,

24  Defendants had to grapple with a different way in which US News rankings system threatened to

25

26  [46] *Id.* at 8–9 (emphasis added). There is no discussion in the Jones Day Report of any "campaign"
    involving US News ever happening. Instead, the Jones Day Report remarks that most alleged

27  communications between USC Rossier and US News "were not well documented, if documented at
    all." Jones Day Report at 8, n. 5.

28  [47] *Id.*

**Exhibit 1**
**27**

expose the lower standards of the online program. Beginning in 2013, US News began conducting a less-publicized specialty ranking of online master's degrees in education, ranking the schools that voluntarily participated. That year, the online Master of Arts in Teaching degree offered by Defendants was ranked at #44, below a number of state schools. It appears after that, USC Rossier stopped participating in this ranking all together to avoid reconciling its poor showing with the inflated general ranking that was central to their message to online students. While US News does not make complete sets of historical of these rankings available to the public, USC Rossier does not appear in any publicly available ranking. From what can be identified in the public record, USC Rossier did not participate at all in the rankings in 2014 or 2016. For 2015, the top 174 schools are publicly available, and it does not appear in that list, so it either did not participate or was ranked even lower. Similarly, for 2017, USC Rossier does not appear in the publicly available list of the top 123 schools; in the list of the top 60 schools for 2018-2020; or the top 40 schools for 2021.

69.     While the Jones Day report states that online data was submitted for this specialty online ranking, it also notes that "some ambiguity existed."[48] With respect to the 2014 and 2016 rankings, USC Rossier did not participate. To the extent it participated again, the 2013 ranking was a high water mark.

70.     The doctoring of selectivity metrics and the inconvenient online MAT rankings were not the only problems. While USC has not made the full extent of the fraud known, the Jones Day report confirms that there were many other irregularities in the submission of USC Rossier data, explaining:

> While this investigation focused on the School's reporting of doctoral selectivity metrics, Jones Day confirmed during the course of the investigation the existence of irregularities in the School's calculation and reporting of research expenditures, and identified other potential data misreporting issues, such as issues relating to the exclusion of online EdD programs, the designation of EdD students as part-time, certain faculty-related metrics, and the School's reporting of teacher job placement and retention statistics. Based on US News's rankings methodology, some of these metrics may have affected the School's US News ranking and warrant further examination.

71.     The misreporting of data continued through a change in leadership. In July 2020, Pedro Noguera replaced Gallagher as USC Rossier's Dean, and in early 2021, Noguera asked others

---

[48] *Id.* at 20.

Exhibit 1
28

at the school why in-person EdD data was being excluded from the school's survey submissions. He was "told it was to increase the School's ranking."[49] Despite this acknowledgment that USC Rossier was gaming the rankings, Noguera again authorized the submission of survey data to US News that excluded EdD data.

72.     The decision to exclude EdD data from USC Rossier's survey submissions was not the product of any mistake or innocent misreading of the US News survey instructions. Rather, USC Rossier did so after ignoring US News' explicit instructions to the contrary and over objections by colleagues that the school was submitting inaccurate survey data. Jones Day concluded the excuses offered by the witnesses it interviewed "do not provide a persuasive justification for that practice."[50]

73.     In the spring of 2022, after years of gaming the rankings, USC abruptly pulled out of consideration after being instructed by USC's Provost to submit survey data that included EdD and PhD data. USC Rossier chose to opt out rather than have US News calculate its ranking based on survey data that included EdD data.[51] In June 2022, US News wrote to USC to ask for "an update and timeline on any further examination of" the other inaccuracies identified by Jones Day, discussed in Paragraph 49. And it reminded USC that it needed to adhere to heightened data requirements to certify the accuracy of its data submissions going forward.[52]

74.     But in the end, USC decided that it would not reveal the truth. Rather, on December 15, 2022, USC announced it would no longer participate in the rankings.

**C.     For Years, Defendants Marketed the Fraudulently-Obtained Best Education Schools Ranking to Prospective Online Students**

75.     Throughout the class period, Defendants have capitalized on their misreporting by heavily marketing USC Rossier's rapid rise toward the top of the US News Best Education Schools rankings to boost student enrollment in the online programs. USC carried out this campaign, both on

---

[49] *Id.*

[50] *Id.* at 16.

[51] *Id.* at 16.

[52] Letter from Kim Castro to Rick J. Caruso and Carol L. Folt (June 6, 2022), available at: https://www.usnews.com/cmsmedia/1d/9d/00ca127c4d1da0641202b13ad519/letter-re-usc-rossier-school-of-education-6-6-2022.pdf

Exhibit 1
29

its own, and through its partner and agent, 2U, directing its false advertising around the country. Not only did students see advertisements first-hand. So did education professionals, family members, academic advisors, and other people mentoring students on their education choices. Defendants took a variety of steps to ensure this audience was exposed to the misrepresentations.

76.      *First,* Defendants know that prospective students routinely consult US News rankings in deciding where to apply and attend, and that the overall Best Education Schools ranking was consulted by students seeking online opportunities. Merely by securing USC Rossier's high ranking, which was published and disseminated by US News, Defendants misled prospective students into believing that they were applying to online programs that were more competitive and higher quality than in reality. The fraudulent ranking first appeared in the publication in the spring of 2009, where it continued to appear and be consulted by prospective students until the spring of 2022.

77.      *Second,* 2U utilized paid online advertising to expand the reach of USC Rossier's rankings to more prospective students. At various points during the class period, 2U purchased search terms from Google, allowing them to display advertisements about USC Rossier to those who sought out top-ranked education graduate programs or similar. These advertisements either represented that USC Rossier was ranked highly by US News or were designed to display an ad for USC Rossier in response to a Google search for top-ranked education graduate schools. Similarly, 2U invested in advertising via display ad networks, allowing the ad networks to track and disseminate online advertising about the top ranked USC Rossier to visitors to its Rossier Website, including the Rossier Online Webpages. These display ad networks worked with Defendants to ensure that pixels or other tracking tools were embedded on these Websites, which in turn allowed the ad networks to monitor visitors' activity around the internet. The ad networks would have purchased advertising space on a variety of websites, such as those hosted by news outlets, bloggers, or other forums that rely on advertising for revenue, so that when a visitor to the USC Rossier website visited those other websites, the display ad network disseminate d2U's desired advertising to them on the other websites.

78.      During the class period, 2U's investments in online advertising were substantial, revealing how broadly and aggressively 2U utilized these tools. For example, in 2014, 2U spent $65,218 in program sales and marketing, its most significant expense, most of which was likely expended on

Exhibit 1
30

USC given that throughout the class period, a significant amount of 2U's revenue was still derived from USC. 2U's yearly program sales and marketing expenses remained massive through the class period, totaling more than half of what it earned in revenue from 2015 through 2021, and just under half of its revenue in 2022.

79.   ***Third,*** since it first decided in late 2008 to exclude in-person and online EdD data from its survey submissions and continuing until it withdrew from the rankings, USC has regularly issued news releases celebrating the school's U.S. News ranking.[53] For instance:

    a.   On April 23, 2009, USC published a "News Alert" on the Rossier Website celebrating the fact that it "ha[d] just been ranked 22nd in U.S. News and World Report's 2010 edition of America's Best Graduate Schools";

    b.   On April 19, 2011, USC published a press release regarding Defendants' Online MAT Program, promoting the fact that "the USC Rossier School was ranked #14 . . . by U.S. News and World Report this year";

    c.   A February 6, 2013, USC Rossier press release entitled "USC Rossier Dean Gallagher Honored by California Superintendents" stated, "Since becoming dean of the USC Rossier School of Education in 2000, Gallagher has moved the school to #15 in the US News & World Report national rankings";  and

    d.   A January 10, 2018, press release authored by USC and a partner education company stated that USC Rossier is "consistently ranked as one of the nation's premier education schools by U.S. News & World Report."

These press releases were intended to get picked up by the media who could and did disseminate that ranking in news stories, blog posts, social media posts, and other fora, to be read by prospective students and others who might share the information with them.

80.   ***Fourth***, throughout the class period, USC Rossier celebrated its rankings via social media, including its Twitter account. For example:

---

[53] *News Alert: U.S. News & World Report Ranks USC Rossier School of Education among Top 25 in 2010 'America's Best Graduate Schools in Education,' among Top 10 in Private Universities* (Apr. 23, 2009), [archived by the WayBack Machine, web.archive.org/web/20090526024726/http://rossier.usc.edu/images/world_news_report.pdf].

Exhibit 1
31

**USC Rossier** @USCRossier · Mar 19, 2012

#USC #Rossier **Ranked** in Top 15 Grad Schools of Education by @USNews goo.gl/Dt8ke

💬 1          ↺ 5          ♡ 1          ⬆

**USC Rossier** @USCRossier · Oct 20, 2013

.@USCRossier again in **US News** top 20 education graduate schools; #HigherEd cited s.shr.lc/1OTxblo #USC

💬 1          ↺ 3          ♡ 3          ⬆

**USC Rossier** @USCRossier · Dec 29, 2013

.@USCRossier again in **US News** top 20 education graduate schools; #HigherEd cited bit.ly/JigQWY #USC

💬 1          ↺ 3          ♡ 5          ⬆

**USC Rossier**
@USCRossier

Some happy news: We have been ranked #11 this year by @usnews in their annual list of graduate schools of education
rossier.usc.edu/usc-rossier-ag…

12:14 PM · Mar 17, 2020 · TweetDeck

**6** Retweets   **2** Quote Tweets   **28** Likes

💬          ↺          ♡          ⬆

**USC Rossier** @USCRossier · Mar 30, 2021

USC Rossier was again named a top graduate school of education in this year's U.S. News index, **ranking** at #11: rossier.usc.edu/usc-rossier-na…

💬          ↺ 7          ♡ 14          ⬆

81.     Gallagher similarly marketed USC Rossier's rankings on her Twitter account when she
was serving as the school's Dean:



82.     *Fifth,* at numerous points throughout the class period, and beginning consistently in
2017, Defendants touted that they were a top-ranked school by US News on the Rossier Website. In
particular, USC, with 2U's knowledge, put on the main homepage for the Rossier Website a statement
advertising that the school was top ranked by US News. By emphasizing that US News had ranked
USC Rossier highly, Defendants ensured that visitors to the Rossier Website would learn of the top
ranking that USC Rossier had obtained that year. And because students must submit online
applications through the Rossier website to apply, by placing it on the Rossier Website's home page,
Defendants further ensured that every student, including the online students, saw that USC was a top-
ranked school by US News.

Exhibit 1
33

83.     Several illustrative examples of the Rossier Website's homepage over the years show how USC, with 2U's consultation, displayed the School's Best Graduate Education Schools ranking at different points during the class period:

a.   May 17, 2009:





b.  December 24, 2013:



c.  From at least March 2017 through at least March 12, 2022—less than two months before the Jones Day Report was published—the Rossier Website consistently displayed its Best Graduate Education Schools ranking on the homepage. Examples of how it appeared in December 6, 2018 (top) and February 13, 2020 (bottom) are below:





Exhibit 1
36

84.     *Sixth*, throughout the class period, Defendants promoted USC Rossier's inflated Best Education Schools ranking across-the-board, to both in-person and online students, masking the difference in its in-person and online degree programs that the data would have revealed. To that end, Defendants repeated on the Rossier Online Webpage that USC Rossier was top ranked. For example:

a.     In 2013, a link to an article celebrating USC Rossier's #17 Best Education Schools rank was featured prominently on the Rossier Online Webpages homepage.[54]

b.     In 2017, the first sentence of the Rossier Online Webpages' "About USC Rossier" page stated: "The USC Rossier School of Education, ranked #15 among graduate schools of education by *U.S. News & World Report*, is one of the world's premier centers for graduate study in urban education."[55]

c.     In 2018, Defendants refer to USC Rossier as "top-ranked" in the first sentence of the 2U-run webpage devoted to USC Rossier' online MAT program, with a note referring to USC Rossier's #10 2018 ranking in US News' "Best Graduate Schools of Education."[56] 2U has also used the same "top-ranked" language to describe USC Rossier's Online Degrees in other marketing materials, including press releases.[57]

85.     All the while, Defendants consistently omitted information about its lower (or non-existent) position in US News' rankings of online master's degrees in education when advertising to online students. Defendants knew this ranking was not well known, would not be sought out by students, and was published at a different time than the Best Graduate Schools of Education ranking, and did not drive the same kind of publicity or interest.

86.     *Seventh,* in carrying out this campaign, Defendants consistently omitted information that may have alerted prospective students to potential fraud. At no point during the class period did

---

[54] USC Rossier Homepage [archived by the Wayback Machine (May 26, 2013), https://web.archive.org/web/20130526034931/http://www.rossier.usc.edu/].

[55] USC Rossier Online, *About USC Rossier* [archived by the Wayback Machine (Nov. 16, 2017), https://web.archive.org/web/20171116152842/https://rossieronline.usc.edu/about/usc-rossier-school-of-education].

[57] PRNewswire, *The USC Rossier School of Education Opens Applications for a New Online Master of Education in School Counseling* (Sept. 25, 2017), www.prnewswire.com/news-releases/the-usc-rossier-school-of-education-opens-applications-for-a-new-online-master-of-education-in-school-counseling-300525108.html

1  Defendants disclose on the Rossier Website that the data used to obtain the US News ranking

2  excluded EdD students, both online and in-person. Rather, Defendants' website structure and

3  representations reveal that they intended for those seeking Online Degrees to view and rely on the

4  Best Education Schools ranking. And Defendants also failed to disclose other information about the

5  Online Degrees that would lead a prospective student to question the reliability of the ranking. For

6  example, Defendants did not disclose on the Rossier Online Webpages things like selectivity

7  information, or average GRE scores.

8        87.      The legacy of Defendants' campaign still lives on, with these advertisements and social

9  media posts leaving an indelible imprint on the web. Even though USC Rossier has abandoned the

10  Best Education Schools Rankings, the "bio" at the top of USC Rossier's MAT program's Twitter page

11  (@USCTeacher) still referred to the "top-ranked @USCRossier School of Education" as of the date

12  of filing this complaint.



But USC Rossier is unranked, and its prior rankings were a lie.

**D.      Defendants Carried Out the Rankings Fraud Because They Knew USC's Rank Was Material to Prospective Students and Would Drive Revenues.**

88.      Defendants engaged in the false advertising campaign because they knew that rankings matter. Indeed, 2U's CEO Christopher "Chip" Paucek tacitly acknowledged the importance of the rankings when explaining that the brands associated with elite universities "drive improved enrollments," which is key to increasing 2U's revenue.[58] And as discussed in Paragraph 47, 2U repeatedly discussed the importance of the rankings and reputation to driving enrollment, and its profits, in communications with shareholders.

89.      Furthermore, as 2U has acknowledged, online degree programs are often associated with for-profit schools, which have a decidedly negative reputation.[59] Importing the prestige of an elite university's brand to the online programs operated by Defendants is critical to 2U's business model, because it gives the imprimatur of the school to 2U's online degree programs. This borrowed legitimacy, coupled with and supported by USC Rossier's high US News rankings, is material to students seeking an online education program. This is especially true where, as here, the marketing materials for USC Rossier's Online Degrees explicitly touted USC Rossier's "top-ranked" status, even though there is no evidence that USC Rossier's Online Degrees broke into the top 40 education schools in US News' Best Online Education Programs rankings from 2013–2021, and in most years was ranked much lower or not ranked at all.

90.      Defendants' actions demonstrate that they understood that USC Rossier's high US News ranking would cause more students to enroll in Defendants' online programs.

91.      *First*, USC Rossier was never required to participate in the US News rankings, which requires considerable effort to prepare and submit responses to US News survey questions on a yearly

---

[58] 2U Q3 2019 Earnings Call Transcript, The Motley Fool (Nov. 13, 2019), www.fool.com/earnings/call-transcripts/2019/11/13/2u-inc-twou-q3-2019-earnings-call-transcript.aspx.

[59] *See* 2U, Inc., Annual Report (Form 10-K) (Mar. 10, 2016), at 29–30, available at www.sec.gov/Archives/edgar/data/1459417/000104746916010989/a2227489z10-k.htm (stating that "significant adverse media coverage" of for-profit online programs could contribute "to skepticism" about 2U's "solutions").

Exhibit 1
39

1  basis. USC demonstrated, by choosing to do so, that US News rankings were important for marketing

2  purposes and to increase school enrollment.

3       92.    **Second**, Defendants' deliberate decision to exclude EdD data from USC Rossier's

4  survey submissions to US News for over ten years for the purpose of inflating USC Rossier's ranking

5  confirms the materiality of these rankings. As discussed above, during her tenure as USC Rossier's

6  Dean, Gallagher continuously maintained that USC Rossier had to exclude EdD data to avoid

7  dropping in the rankings. Gallagher did so even while she and her colleagues at USC Rossier

8  acknowledged that US News's survey submissions required this data. Indeed, both Gallagher and

9  Noguera continued to exclude EdD data even after US News's survey instructions in 2018 expressly

10  confirmed what had always been the case: schools were required to submit this data.

11       93.    **Third**, Defendants' decision to heavily promote USC Rossier's inflated US News

12  rankings during the relevant period demonstrates their understanding of the materiality of these

13  rankings. Defendants would not have celebrated the school's rankings in these materials if they did

14  not think prospective students would rely on this information in deciding where to enroll.

15       94.    **Fourth**, the publication of the Jones Day report in April 2022, detailing Defendants'

16  years-long misreporting scheme arrived in the wake of similar US News ranking fraud scandals

17  (including a criminal charge of wire fraud) that has plagued well-known institutions like Columbia

18  University, Rutgers Business School, and Temple University Business School.[60] These revelations

19  underscore the industry-wide understanding, shared by Gallagher and Noguera, as well as 2U, that US

20  News rankings were critically important to the perception of a school, and to students' decisions

21  regarding where to enroll.

22

23

24

---

25  [60] Nick Anderson, Susan Svrluga, *Columbia acknowledges giving incorrect data for U.S. News rankings*,
Washington Post (Sept. 9, 2022), www.washingtonpost.com/education/2022/09/09/columbia-

26  usnews-college-ranking/; Ted Sherman, *Rutgers created fake jobs for graduates to boost MBA program rankings, lawsuit charges*, NJ.com (Apr. 10, 2022), www.nj.com/education/2022/04/rutgers-created-

27  fake-jobs-for-graduates-to-boost-mba-program-rankings-lawsuit-charges.html; Associated Press,
*Former Temple U Business Dean Sentenced in Rankings Scandal*, US News,(Mar. 11, 2022),

28  www.usnews.com/news/us/articles/2022-03-11/former-temple-u-business-dean-sentenced-in-rankings-scandal.

**E.      Students Were Harmed By Defendants' Fraud and Profit-Seeking Motives.**

95.     Defendants' fraudulent scheme to climb the US News rankings has benefited them tremendously, at the expense of the students who Defendants deceived. Driven by the false perception that USC Rossier is a "top-ranked" program, hundreds of students enrolled in Defendants' Online Degrees every year. Further, USC Rossier's artificially-inflated US News ranking has enabled Defendants to charge these students significantly higher tuition than these students would pay if they attended other online or in-person graduate education programs in California.

96.     Because rankings are so important, class members relied on them to their detriment. Not only did many thousands of students enroll, but they did so at a steep premium, as prospective education students who considered attending USC Rossier's online programs from 2009–2021 had many cheaper options for graduate education schools to attend. For instance, between the 2014–2015 and 2015-2016 academic years, USC Rossier's Online MAT program cost between $48,060 and $53,726.[61] These steep prices are significantly higher than the tuition charged by other in-person or online graduate schools of education programs.

97.     Because USC is one of the most expensive schools in the country, 2U's relationship with USC, and the related rankings scam were a big profit-driver for 2U. For example, for an EdD student seeking a Doctor of Education in Organizational Leadership, who paid up to $115,680 in the 2019–2020 academic year for their degree, 2U would have received $69,408 from this student under an agreement where it would receive 60% of tuition, its typical arrangement. With 2U enrolling hundreds of such students every year, it may have earned $14 million or more annually from that one degree.

---

[61] *See* USC Rossier Online, *Tuition & Financial Aid*, (2014–2015), http://rossieronline.usc.edu/academics/master-of-arts-in-teaching-program/tuition-financial-aid [archived by the WayBack Machine, https://web.archive.org/web/20150413055050/http://rossieronline.usc.edu/academics/master-of-arts-in-teaching-program/tuition-financial-aid/ (citing a capture dated April 13, 2015)]; *see also*, USC Rossier Online, *Tuition & Financial Aid*, (2015–2016), https://rossieronline.usc.edu/academics/master-of-arts-in-teaching-program/tuition-financial-aid, [archived by the WayBack Machine, https://web.archive.org/web/20160425150610/https://rossieronline.usc.edu/academics/master-of-arts-in-teaching-program/tuition-financial-aid (citing a capture dated April 13, 2015)].

98.     In 2014, 2U was able to go public, even though 70% of its revenue came from its partnership with just two schools: USC Rossier and USC's Dworak-Peck School of Social Work.[62] In the years that followed, while 2U continued to form partnerships with more universities, acquiring more revenue sources, USC continued to be a steady source of revenue. As of 2019, over one-fifth of 2U's revenue came from USC.[63]

99.     2U has emphasized the need to drive enrollment for USC's programs in particular, stating in 2018: "A significant portion of our revenue is currently attributable to graduate programs with the University of Southern California. *The loss of, or a decline in enrollment in, these programs could significantly reduce our revenue.*"[64]

100.    As described in Paragraph 33, there is no evidence that USC put limits on the number of people enrolled, and rather, left it to 2U's discretion. What's more, under their contract, 2U would receive a higher percentage of revenues if it recruited more people, and if USC restricted enrollment or imposed stricter admissions criteria, 2U could blow up the parties' non-compete agreement.

101.    Typically, institutions of higher education have no incentive to allow their OPMs to engage in unlimited recruitment and use weakened admissions criteria. Doing so would hurt their standing in the US News rankings, because it would give them a worse student selectivity score. And it would be a futile endeavor, because in the end, the lower ranking would decrease enrollment, cannibalizing any prospect of increased revenue. Here, however, the Best Education Schools ranking did not require any reporting of selectivity numbers for online MAT students, and thus, it did not present a barrier to unlimited enrollment——which no doubt made it an attractive degree to serve as a launchpad for 2U's business in the first instance. And while US News required selectivity numbers for

---

[62] Ryan & Hamilton, *supra*. n. 14.  In 2018, a Wall Street Journal investigation into that school of social work found that instead of maximizing their educational opportunities, 2U maximized its profits by leveraging USC's prestige image to aggressively target prospective students into the online school, where the education provided was not the same as what was offered to those attending in-person. *See* Bannon & Fuller, *supra* n. 9. The students in turn took on huge debt loads to pay the same tuition rates for an in-person master's degree, despite not receiving a comparable education. *Id.*

[63] *Id.*

[64] 2U, Inc., Annual Report (Form 10-K) (Feb. 27, 2018) at 22, www.sec.gov/Archives/edgar/data/1459417/000104746918001109/a2234625z10-k.htm 10-K (emphasis added).

Exhibit 1
42

the EdD programs, 2U and USC overcame that by just not providing accurate data. By reporting incomplete data and promoting the false rankings, Defendants had their ratings cake and revenues too.

**EXPERIENCES OF THE NAMED PLAINTIFFS**

A.   **Iola Favell**

102.   Iola Favell grew up in California and was a first-generation college student who received her undergraduate degree in 2019 from the University of Alabama.

103.   Ms. Favell graduated with honors from the University of Alabama with a 3.8 grade point average and was a strong candidate for a selective graduate program in teaching.

104.   Ms. Favell planned to return to California to begin her teaching career and to pursue a master's degree. When choosing a master's program, Ms. Favell wanted to attend a well-known, prestigious school.

105.   Ms. Favell was familiar with US News' rankings of educational institutions and considered US News rankings to be an important resource when determining where to enroll in a graduate education program. In or about the first part of 2020, while living in Newport Beach, California, Ms. Favell reviewed the US News "2021 Best Education Schools" list (US News sometimes publishes a year's rankings during the prior year). Ms. Favell became interested in USC Rossier because it was ranked highly (number 12) on US News' Best Education Schools rankings. This ranking was a significant factor in Ms. Favell's decision-making process.

Exhibit 1
43

106.     Around that same time, in or about the first part of 2020, Ms. Favell also reviewed the Rossier Website. Ms. Favell saw that USC Rossier represented on its homepage, rossier.usc.edu, that it was ranked #12 among the "best schools of education," by US News. USC Rossier's website prominently displayed its US News ranking on its homepage, as shown in this archived screenshot from February 22, 2020:[65]



107.     Around this time, Defendants assigned Ms. Favell an "application advisor," who, provided personal assistance throughout her application process. The advisor, unbeknownst to Ms. Favell was employed by 2U, not USC Rossier. The application advisor's email signature falsely identified the advisor as an "Executive Admissions Counselor" with the USC Rossier Office of Admission and Scholarship.

108.     In at least one conversation in or around March 2020, Ms. Favell informed her advisor of the importance of USC Rossier's ranking in her decision to apply. The application advisor called Ms. Favell, sometimes as often as every other day, to help with different components of her application. The advisor offered to waive application fees, and Ms. Favell received fee waivers for all components of her application.

---

[65] USC Rossier Homepage [archived on the WayBack Machine (Feb. 22, 2020), https://web.archive.org/web/20200222044804/https://rossier.usc.edu/].

109.    In or around May 2020, Ms. Favell was accepted to the USC Rossier MAT program. Ms. Favell's application advisor personally called to tell her the news.

110.    The US News rankings were the most important reason that Ms. Favell accepted the offer of admission to USC Rossier's online Master of Arts in Teaching (MAT) program. She enrolled and began coursework for her degree in August 2020 and graduated in May 2021.

111.    Ms. Favell is now a public elementary school teacher in Los Angeles, with over $100,000 in student loan debt attributable to the cost of attending USC Rossier.

112.    Ms. Favell relied to her detriment on the falsified US News ranking when deciding to attend USC Rossier and pay the associated costs. To pay for the tuition, fees, and other expenses associated with the program, Ms. Favell took out Grad PLUS and Stafford federal student loans. Ms. Favell incurred significant debt and out of pocket expense in reliance on USC Rossier's position in the US News ranking. She regrets her decision to attend USC Rossier because of the false rankings information. She would not have attended had USC Rossier been ranked in a lower position given the high price tag of the school and/or would not have paid nearly as much.

**B.    Sue Zarnowski**

113.    Sue Zarnowski grew up in Connecticut and received undegraduate degrees in Communications and Spanish from Southern Connecticut State University in 2011 and a master's degree in industrial and organizational psychology from the University of New Haven in 2012.

114.    Between 2012 and 2018, Ms. Zarnowski held a variety of positions in the higher education space, including the division of student affairs and Dean of Students office. Her mentor advised Ms. Zarnowski to obtain a doctorate if she wanted to advance in the higher education field. At the time, she was living in Indiana and wanted the flexibility of online classes.

115.    In or around 2016, Ms. Zarnowski became interested in getting a doctorate in education. When researching institutions for her doctoral degree, Ms. Zarnowski wanted a university with brand name recognition and prestige. She recalls conducting Google searches for top EdD programs, and the paid search results displayed USC Rossier. During all relevant times, 2U purchased Google search terms, which caused Ms. Zarnowski to receive paid search result advertisements highlighting USC Rossier's rankings. She performed additional research, confirming that USC Rossier

offered an online EdD program and was highly ranked by US News. She also understood that USC classes would be small, allowing her to build relationships with professors. While she began an application and provided her contact information to USC Rossier, she decided to postpone her graduate studies, and she did not complete her application.

116.    In or around April of 2018, Ms. Zarnowski received an advertisement stating that USC Rossier was ranked as a Top 10 graduate school by US News. She decided that it was a good time to revisit her goal of getting an EdD, and conducted further research. She again researched online doctoral programs on Google, and again received paid search ads that promoted USC Rossier's ranking as a result of 2U's efforts.

117.    Between April and June 2018, Ms. Zarnowski visited the USC Rossier website and saw that it represented on its homepage, rossier.usc.edu, that it was ranked #10 among the "best schools of education," by US News. USC Rossier's website prominently displayed its US News ranking on its homepage, as shown in this archived screenshot from June 12, 2018:[66]



---

[66]  USC Rossier Homepage [archived on the WayBack Machine (June 12, 2018) https://web.archive.org/web/20180612111325/https://rossier.usc.edu/].

Exhibit 1
46

118.    Around that same time, on various occasions when she visited Facebook, she received advertisements for USC Rossier that said the school was top ranked by US News.  During all relevant times, 2U and USC maintained pixels and other tracking tools on their website, and 2U purchased targeted advertising on Facebook. Ms. Zarnowski received these paid display advertisements highlighting USC Rossier's ranking because of those tracking efforts.

119.    In or around June 2018, Defendants assigned Ms. Zarnowski an admissions counselor. The advisor's email signature falsely identified the advisor as an "Admissions Counselor" with the Rossier School of Education and did not disclose an affiliation with 2U.

120.    Ms. Zarnowski applied to USC Rossier's Doctor of Education in Organizational Change and Leadership program in June 2018. The most significant factor in Ms. Zarnowski's decision to apply, and later, to accept, was its high ranking in the US News & World Report ranking of "Best Graduate Schools – Education Schools." Ms. Zarnowski was particularly drawn to the USC Rossier's position among the top ten education schools. She was very familiar with the importance of the rankings from her work in higher education. She believed that the reputation and US News ranking would provide a strong return on her investment.

121.    Around that same time, Ms. Zarnowski discussed with her advisor the importance of USC Rossier's high ranking in her decision to attend the School.

122.    Ms. Zarnowski was accepted into the program in July 2018, and started classes in August. She found that her cohort was over-enrolled. Her professors regularly complained that it was difficult to give feedback to so many students.

123.    Ms. Zarnowski graduated from USC Rossier with her Doctor of Education in 2021. She thought she would be able to secure a higher-level job in the field but has been unable to do so. She is no longer working in higher education.

124.    Ms. Zarnowski relied to her detriment on the falsified US News ranking when deciding to attend USC Rossier and pay the associated costs. To pay for the tuition, fees, and other expenses associated with the program, she incurred around $100,000 in debt—most of which was federal student loans–and used savings along with a $7,500 scholarship. She still owes $41,000 in loan payments. She regrets her decision to attend USC Rossier because of the false ranking information.

Exhibit 1
47

1   She would not have attended had USC Rossier been ranked in a lower position given the high price

2   tag of the school and/or would not have paid nearly as much.

3        125.   Ms. Zarnowski currently holds two jobs to help pay off her $41,000 debt and is living

4   with her parents.

5   **C.   Mariah Cummings**

6        126.   Mariah Cummings grew up in California and received her undergraduate degree from

7   San Francisco State University in 2018.

8        127.   Ms. Cummings graduated from San Francisco State University with a 3.8 grade point

9   average and was a strong candidate for a selective graduate program in teaching.

10        128.   In or around the end of 2018 or beginning of 2019, while Ms. Cummings was living

11   in California, she decided to pursue a master's degree in teaching but wanted the flexibility to attend

12   from any location and thus focused on institutions that offered programs online. Ms. Cummings

13   wanted to attend a high-quality, selective institution and was a strong candidate to do so.

14        129.   Ms. Cummings was familiar with US News' rankings of educational institutions and

15   considered them as an important resource when determining where to enroll in a graduate education

16   program. Ms. Cummings researched where to enroll in or around the end of 2018 or the beginning of

17   2019. During this time, Ms. Cummings reviewed the US News "2018 Best Education Schools"

18   rankings on the US News website. USC Rossier's high position in these rankings (#10) confirmed to

19   her that the school was a selective institution and was a significant factor in her decision-making

20   process.

21

22

23

24

25

26

27

28

**Exhibit 1**
**48**

130.     Around that same time, in or around the end of 2018 or the beginning of 2019, Ms. Cummings also visited the Rossier Website. Ms. Cummings saw on USC Rossier's homepage, rossier.usc.edu, that USC was ranked #10 among "Best Schools of Education" by US News. USC Rossier's website prominently displayed its US News ranking on its homepage, as shown on the below archived screenshot from December 6, 2018:



131.     Around this same time, Ms. Cummings also conducted at least one Google search to identify prestigious graduate education schools where she might be able to obtain an online degree, and the paid search results advertised USC Rossier as a top-ranked school. During all relevant times, 2U purchased Google search terms, which caused Ms. Cummings to receive paid search result advertisements highlighting USC Rossier's rankings.

132.     2U also paid to have advertising about USC Rossier's Best Education Schools rankings disseminated via a display advertising network, causing Ms. Cummings to view additional advertising about USC Rossier's ranking when browsing the internet for unrelated matters.

133.     Ms. Cummings was admitted to USC Rossier four weeks after she applied. The US News rankings were the most important reason that Ms. Cummings accepted the offer of admission

to USC Rossier's online Master of Arts in Teaching (MAT) program. She enrolled and began coursework for her degree in May 2019 and graduated in May 2021.

134. Ms. Cummings relied to her detriment on the falsified US News ranking when deciding to attend USC Rossier and pay the associated costs. To pay for the tuition, fees, and other expenses associated with the program, Ms. Cummings took out federal student loans. Ms. Cummings incurred significant debt and out of pocket expense in reliance on USC Rossier's position in the US News ranking. Ms. Cummings still has more than $100,000 in student loan debt. She regrets her decision to attend USC Rossier because of the false rankings information. She would not have attended had USC Rossier been ranked in a lower position, given the high price tag of the school and/or would not have paid nearly as much.

## CLASS ACTION ALLEGATIONS

135. Plaintiffs bring this class action on behalf of themselves and the following Classes of persons:

Class: All students who were enrolled in an online graduate degree program at USC Rossier, from April 1, 2009, through April 27, 2022. Excluded from the Class are Defendants' officers, directors, affiliates, representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

136. Numerosity: The members of the proposed Class are so numerous that individual joinder of all members is impracticable. Review of USC Rossier's recent graduate ceremony programs reveals that there have been approximately 300 students enrolled just in Defendants' online Master's of Arts in Teaching program each year. Hundreds more were enrolled each year in each of Defendants' other five online master's degree programs, and in Defendants' four online EdD programs. Thus, many thousands of current and former students are likely included in the Class. The exact number and identities of the members of the proposed Classes are unknown at this time, but can be ascertained through appropriate discovery, which is exclusively in Defendants' possession.

137. Common Questions of Law and Fact Predominate: There are many questions of law and fact common to Plaintiffs and the Classes and those questions substantially predominate over any

1    questions that may affect individual Class members. Common questions of law and fact include, but

2    are not limited to:

      a.   Did Defendants knowingly misreport data in surveys submitted by USC Rossier to US News?

      b.   Did Defendants promote USC Rossier's US News rankings to prospective applicants to Rossier's online programs, knowing that the rankings were based on false and incomplete information?

      c.   Did Defendants falsely state or misrepresent that USC Rossier's Best Education Schools ranking applied to its Online Degree programs?

      d.   Did Defendants violate federal law or regulations?

      e.   Did Defendants violate California law?

      f.   Were Defendants unjustly enriched as a result of their improper conduct?

13   138.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have been similarly affected by the actions of Defendants. Defendants' conduct as described herein is the same or substantially the same for Plaintiffs and all members of the Class. Defendants advertised the fraudulent rankings in a systematic and widespread way, and have established systematic and automated policies and practices to govern recruitment and the manner in which they enroll students. Thus, the experiences of Plaintiffs are typical.

19   139.   <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel at Tycko & Zavareei LLP with substantial experience in prosecuting complex and consumer class action litigation, as well as with experience litigating against schools and universities more specifically. Plaintiffs have also retained counsel at the National Student Legal Defense Network, who are experts in higher education law and policy, and have significant experience litigating to protect students' rights, including class action litigation on behalf of students misled by for-profit colleges. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

27   140.   <u>Superiority of Class Action</u>: Plaintiffs and the members of the Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct. A class action is

Exhibit 1
51

1  superior to other available methods for the fair and efficient adjudication of the present controversy.

2  Individual joinder of all members of the Class is impractical. Even if individual Class members had

3  the resources to pursue individual litigation, it would be unduly burdensome to the courts in which

4  the individual litigation would proceed. Individual litigation magnifies the delay and expense to all

5  parties, as well as the court system, in resolving the controversies engendered by Defendants' common

6  course of conduct. The class action device allows a single court to provide the benefits of unitary

7  adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a

8  single forum. The conduct of this action as a class action conserves the resources of the parties and

9  of the judicial system and protects the rights of the Class members.

10      141.    <u>Risk of Inconsistent or Varying Adjudication</u>: Class treatment is proper and this action

11  should be maintained as a class action because the risks of separate actions by individual members of

12  the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual

13  Class members which would establish incompatible standards of conduct for Defendants as the parties

14  opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a

15  practical matter, be dispositive of the interests of other Class members not party to the adjudication

16  or would substantially impair or impede their ability to protect their interests.

17      142.    <u>Action Generally Applicable to Classes as a Whole</u>: Defendants, as the parties that may

18  potentially oppose certification of the Class, have acted or refused to act on grounds generally

19  applicable to them, thereby making appropriate final injunctive relief or corresponding declaratory

20  relief with respect to them as a whole.

21          **DISCOVERY RULE AND FRAUDULENT CONCEALMENT TOLLING**

22      143.    While Defendants began submitting inaccurate, incomplete data to US News in

23  connection with the Best Education Schools ranking in or around the fall of 2008, Defendants did

24  not make known the omissions and inaccuracies in their survey responses to US News in connection

25  with the ranking until the public release of the Jones Day report in April 2022.

26

27

28

**Exhibit 1
52**

144.    As the Jones Day report identifies other discrepancies and calls for further investigation,[67] the full extent of Defendants omissions and inaccuracies is still not known. Defendants have never made their survey responses nor the data on which they relied and excluded public. Defendants knew the data submissions were fraudulent, and concealed the fraud to protect their reputation and financial interests. USC's December 15, 2022 announcement that it would withdraw from the rankings, rather than accept a ranking based on complete data, indicates that Defendants always intended to withhold this information from the public, and wish to continue to do so.

145.    Class members who were enrolled in a USC Rossier online graduate program outside of the applicable statute of limitations could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and submitting fraudulent data to US News.

146.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to all claims set forth below. And all applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment of the facts alleged herein throughout the time period relevant to this action.

**FIRST CAUSE OF ACTION**
**Violations of False Advertising Law (California Business and Professions Code § 17500)**
**(Untrue or Misleading Representations)**
**By Plaintiffs and on Behalf of the Class**
**Against Defendants USC and 2U**

147.    Plaintiffs restate and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

148.    From a date unknown to Plaintiffs and continuing to the present, Defendants USC and 2U have and continue to engage in, including by aiding and abetting each other, acts or practices that constitute violations of Business and Professions Code § 17500 *et seq.*, by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Defendants' services, namely online graduate education programs at USC Rossier.

---

[67] Ex. B, §IV.B.

**Exhibit 1**
**53**

149.     Defendants' untrue or misleading representations to the Class include, but are not limited to, written misrepresentations and omissions to Plaintiffs and the Class regarding USC Rossier's status as a school with in-person and online degree programs that are highly ranked by US News. Defendants enabled USC Rossier to achieve its rankings from 2009-2021 only by intentionally submitting false data to US News regarding USC Rossier's student selectivity, and potentially other criteria. Accordingly, Defendants' online programs were never truly "top ranked" by US News because said ranking was artificially inflated by Defendants' submission of false information.

150.     The long term, coordinated campaign and pattern of misrepresentations and omissions is described in Paragraphs 45–46, 57, 75–87, above. All Plaintiffs and the class were exposed to that campaign. Specific misrepresentations and omissions on which the Plaintiffs relied are set forth as follows: Iola Favell (Paragraphs 105–108, 110), Sue Zarnowski (Paragraphs 115–121), and Mariah Cummings (Paragraphs 129–132).

151.     At the time of the campaign, and the related pattern of misrepresentations and omissions set forth in the preceding paragraphs were made, Defendants knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

152.     Plaintiffs and the class were injured by reason of Defendants' false and deceptive advertising, as all paid tuition and fees and/or paid a price premium on those tuition and fees, as a result of Defendants' false advertising. Examples of Plaintiffs' losses are set forth as follows: Iola Favell (Paragraphs 111–12), Sue Zarnowski (Paragraphs 122–25), and Mariah Cummings (Paragraph 134).

153.     As a result of Defendants' untrue or misleading representations and omissions, Plaintiffs and the members of the Class are entitled to an order, pursuant to Business and Professions Code § 17535, enjoining such future conduct by Defendants and such other orders and judgments that may be necessary to provide restitutionary disgorgement of Defendants' ill-gotten gains and to restore to any Class member all monies paid as a result of Defendants' false or misleading statements.

**SECOND CAUSE OF ACTION**
**Violations of Business and Professions Code § 17200**
**(Unfair Competition)**
**By Plaintiffs and on Behalf of the Class**
**Against Defendants USC and 2U**

154. Plaintiffs restate and incorporate by reference the allegations in all paragraphs above as though fully set forth herein.

155. From a date unknown to Plaintiffs and continuing to the present, Defendants USC and 2U have and continue to engage in, including by aiding and abetting each other, business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business acts and practices are unlawful, unfair, and deceptive within the meaning of that statute.

156. The business acts and practices engaged in by 2U and USC that violate the Unfair Competition Law include:

    a. Disseminating a wide spread, long term false advertising campaign to promote the fraudulently procured US News ranking of USC Rossier;

    b. Providing Plaintiffs and members of the Class with untrue, misleading, unreliable, and/or inaccurate information concerning USC Rossier's US News' rankings;

    c. Omitting material facts concerning how Defendants enabled USC Rossier to achieve its US News rankings and how those rankings do not include data reflecting enrollment and selectivity of USC Rossier's EdD programs, and by extension, any of USC Rossier's online degrees; and

    d. Doing each and all of the above to induce Plaintiffs and members of the Class to enroll at USC Rossier, and pay tuition at an inflated price.

157. These business acts and practices are ***unlawful*** because they violate laws including:

    a. Business and Professions Code § 17500, as set forth herein;

    b. 34 C.F.R. 668.72, which broadly prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs. . . ."

    c. Civil Code §§ 1770(a)(1), (2), (3), (5), (7), (9) and (14), as set forth herein.

**Exhibit 1**
**55**

158.     These business acts and practices are **_unfair_** in that 2U and USC have caused students to pay tens of thousands of dollars and undertake huge credit obligations to pursue online graduate education opportunities that they would not have pursued, or at a minimum, would not have paid a high premium for USC Rossier's ranking, but rather, would have paid significantly less than advertised. These acts and practices violate public policy and are also immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

159.     These business acts and practices are **_deceptive_** in that Defendants' untrue and misleading long term campaign was likely to, and in fact did, deceived Plaintiffs, the Class, and the public. As set forth in Paragraph 150 and the referenced paragraphs therein, this campaign included the pattern of representations and omissions regarding USC Rossier's rankings in the 2010-2021 editions of the US News Best Education Schools, published annually and disseminated between the spring of 2009 up until the spring of 2022.

160.     Plaintiffs and the class were injured by reason of Defendants' unfair, unlawful, and deceptive conduct, as all paid tuition and fees and/or paid a price premium on those tuition and fees, as a result of Defendants' false advertising. Examples of Plaintiffs' losses are set forth as follows: Iola Favell (Paragraphs 111–12), Sue Zarnowski (Paragraphs 122–25), and Mariah Cummings (Paragraph 134).

161.     As a result of Defendants' unlawful, unfair, and deceptive business acts and practices, Plaintiffs and the members of the Class are entitled to an order, pursuant to Business and Professions Code § 17203, enjoining such future conduct by Defendants and such other orders and judgments that may be necessary to provide restitutionary disgorgement of Defendants' ill-gotten gains and to restore to any Class member all monies paid as a result of Defendants' conduct.

### THIRD CAUSE OF ACTION
**Violations of Civil Code § 1770**
**(Consumer Legal Remedies Act)**
**By Plaintiffs and on Behalf of the Class**
**Against Defendants USC and 2U**

162.     Plaintiffs restate and incorporate by reference the allegations in all Paragraphs above as though fully set forth herein.

163. From a date unknown to Plaintiffs and continuing to the present, Defendants USC and 2U have and continue to engage in, including by aiding and abetting each other, practices that violate the Consumer Legal Remedies Act, Civil Code § 1770 *et seq.*, specifically unfair, deceptive, unlawful, and unconscionable commercial practices in connection with the sale of services to consumers.

164. Plaintiffs and the members of the Class are "consumers" as defined by Civil Code § 1761(d). The professional graduate degree or certification programs promoted and provided by Defendants are "services" as defined by Civil Code § 1761(b).

165. The practices engaged in by USC and 2U that violate the Consumer Legal Remedies Act include those detailed in Paragraph 150 and the paragraphs referenced therein, as follows:

    a. Disseminating a wide spread, long term false advertising campaign to promote the fraudulently procured US News ranking of USC Rossier,;

    b. Providing Plaintiffs and members of the Class with untrue, misleading, unreliable, and/or inaccurate information concerning USC Rossier's US News' rankings;

    c. Omitting material facts concerning how Defendants enabled USC Rossier to achieve its US News rankings and how those rankings do not include data reflecting enrollment and selectivity of USC Rossier's EdD programs, and by extension, any of USC Rossier's online degrees; and

    d. Doing each and all of the above to induce Plaintiffs and members of the Class to enroll at USC Rossier, and pay tuition at an inflated price.

*See, e.g.*, Civil Code §§ 1770(a)(1), (2), (3), (5), (7), (9), (14).

166. As a result of Defendants' violations, Plaintiffs and the members of the Class suffered ascertainable monetary losses in the form of tuition and fees that they paid in full or at a premium (including in the form of debts they incurred for Defendants' graduate education programs (including interest)), which they would not have incurred but for Defendants' unlawful practices. Examples of Plaintiffs' losses are set forth as follows: Iola Favell (Paragraphs 111–12), Sue Zarnowski (Paragraphs 122–25), and Mariah Cummings (Paragraph 134).

167.    CLRA § 1782 NOTICE. Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiffs specifically disclaim, at this time, any request for damages under any provision of the CLRA. Pursuant to Civil Code § 1782, on December 20, 2022, the date of the filing of this Complaint, Plaintiffs are sending via certified mail, return receipt requested, a written notice to Defendants' principal places of business, setting forth the particular violations of § 1770. In that letter, Plaintiffs demand that Defendants rectify the actions described above by providing monetary relief, agreeing to be bound by their legal obligations, and giving notice to all affected customers of their intent to do so within thirty (30) days. Defendants' failure to do so will result in Plaintiffs amending this Class Action Complaint to seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

**FOURTH CAUSE OF ACTION**
**Quasi-Contract Claim for Restitution ("Unjust Enrichment")**
**By Plaintiffs and on Behalf of the Class**
**Against Defendants 2U and USC**

168.    Plaintiffs restate and incorporate by reference the allegations in all Paragraphs above as though fully set forth herein.

169.    To the extent it is required, this claim is alleged as an alternative theory of relief.

170.    USC and 2U were unjustly enriched at the expense of Plaintiffs and the other members of the Class, who were enrolled in online degree programs that were significantly less valuable than advertised, and who were inequitably charged excessive tuition by Defendants.

171.    Plaintiffs and the other members of the Class were unjustly deprived of money obtained by USC and 2U as a result of their undisclosed, unfair, unscrupulous, and unconscionable recruiting and enrollment practices.

172.    It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other members of the Class as a result of their wrongful conduct alleged in this Complaint.

Exhibit 1
58

173.     Plaintiffs and the other members of the Class are entitled to seek and do seek restitution from USC and 2U as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by USC and 2U by virtue of their wrongful conduct.

174.     Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

175.     Under the doctrine of unjust enrichment, it is inequitable for USC and 2U to be permitted to retain the benefits they have received, and are still receiving, without justification. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

176.     The financial benefits derived by USC and 2U rightfully belong to Plaintiffs and members of the Class. As needed, a constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiffs and the members of the Class.

177.     Plaintiffs and the members of the Class have no adequate remedy at laws

178.     To the extent required, this claim is alleged as an alternative theory of relief.

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, request that this Court:

(a)     Certify this case as a class action and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(b)     Award Plaintiffs and Class Members declaratory relief as permitted by law or equity;

(c)     Award Plaintiffs and Class Members actual, incidental, and consequential damages and available forms of recovery in an amount to be proven at trial, including any and all available compensatory damages, punitive damages, restitution, any applicable penalties and interest;

(d)     Award all reasonable costs and attorneys' fees incurred by Plaintiffs, pursuant to, without limitation, the California Legal Remedies Act and California Code of Civil Procedure § 1021.5;

(e)     Set a trial by jury of all matters; and

1    (f)      Award such other and further relief as the Court may deem just and equitable.

2

3    Date: December 20, 2022                     _/s/ Kristen G. Simplicio_

4                                              Kristen G. Simplicio (State Bar No. 263291)
                                              Anna Haac (*pro hac vice* forthcoming)

5                                              **TYCKO & ZAVAREEI LLP**
                                              2000 Pennsylvania Avenue Northwest, Suite 1010

6                                              Washington, District of Columbia 20006
                                              Telephone: (202) 919-5852

7                                              Facsimile: (202) 973-0950
                                              *ksimplicio@tzlegal.com*

8                                              *ahaac@tzlegal.com*

9                                              Sabita J. Soneji (State Bar No. 224262)
                                              Cameron R. Partovi (State Bar No. 319589)

10                                             **TYCKO & ZAVAREEI LLP**
                                              1970 Broadway, Suite 1070

11                                             Oakland, California 94612
                                              Telephone: (510) 254-6808

12                                             Facsimile: (202) 973-0950
                                              *ssoneji@tzlegal.com*

13                                             *cpartovi@tzlegal.com*

14                                             Eric Rothschild (pro hac vice forthcoming)
                                              **NATIONAL STUDENT LEGAL**

15                                             **DEFENSE NETWORK**
                                              1701 Rhode Island Avenue Northwest

16                                             Washington, District of Columbia 20036
                                              Telephone: (202) 734-7495

17                                             *eric@defendstudents.org*

18                                             *Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

**Exhibit 1
60**